UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IAN MOORE, AND 5,628 OTHER
INDIVIDUALS,

                          Petitioners,

              -against-

MLB ADVANCE MEDIA, L.P.,

                          Respondent.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/27/2026__

25 Civ. 3121 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Petitioners, 5,628 individuals,[1] move to compel MLB Advanced Media, L.P. ("MLBAM") to arbitrate claims arising under the Video Privacy Protection Act ("VPPA"), the California Information Privacy Protection Act ("CIPPA"), and various other consumer protection laws. *See* Pet., ECF No. 2; Mot., ECF No. 4; Mem., ECF No. 5; Reply, ECF No. 31. MLBAM argues that Petitioners have failed to meet their burden of establishing that they entered an agreement to arbitrate and moves to sever Petitioners' claims. *See generally* Opp., ECF No. 28. For the reasons stated below, Petitioners' motion to compel arbitration and MLBAM's cross-motion to sever Petitioners' claims are both DENIED without prejudice.

**BACKGROUND**[2]

I.      Petitioners

"MLBAM operates the MLB.TV and the MLB.com websites, which provide premium prerecorded video content, including documentaries, classic programs, and World Series Films to

---

[1] Although Petitioners claim there are 5,629 petitioners, *see* Pet. ¶ 1, ECF No. 2, only 5,628 individuals submitted declarations. *See* Opp. at 9 (citing ECF No. 2-1 and Nos. 2-5 through 2-18); ECF No. 28.

[2] The following facts are taken from Petitioners' memorandum in support of their motion, Respondent's opposition, and the accompanying declarations and exhibits. *See Ostreicher v. TransUnion, LLC*, No. 19 Civ. 8174, 2020 WL 3414633, at *1 n.2 (S.D.N.Y. June 22, 2020) ("It is proper (and in fact necessary) to consider extrinsic evidence when faced with a motion to compel arbitration." (cleaned up)).

paid subscribers of MLB.TV and MLB.com accountholders." Mem. at 1; *see* Frost Decl. ¶¶ 3–4, ECF No. 28-1. Petitioners are "MLB.TV customers and MLB.com accountholders who seek to bring arbitrations against MLBAM" for violations of the VPPA, various common law torts, violations of the CIPPA, and various consumer protection laws. Mem. at 1–2. Petitioners allege that MLBAM embedded "the Facebook Tracking Pixel" ("Facebook Pixel") in its digital properties,[3] "through which MLBAM transmit[ted] Petitioners' personally identifiable information and video watching history to Facebook." *Id.* at 2. The Facebook Pixel is a "digital tool—invisible to the ordinary consumer—which tracks user-actions on Facebook advertisers' websites and reports them back to Facebook." *Id.* Petitioners bring this motion to compel MLBAM to arbitrate their claims after Petitioners initiated arbitration and MLBAM did not pay its initiation fee. *See id.* at 6, 17–19.

Petitioners, 5,628 individuals, have each submitted declarations in connection with their motion. *See* ECF No. 2-1; ECF Nos. 2-5 through 2-18. Outside of identifying information (name, email address), each declaration appears to be identical and states in relevant part: (1) "I . . . am an MLB.com subscriber"; (2) "I signed up for an MLB.com account by creating an account on MLB.com, purchasing an MLB.TV subscription or an MLB At Bat subscription, or logging into MLB.com using my TV provider or Amazon Prime information"; (3) "The MLB.com account belongs to me and not to a third party"; and (4) "I viewed videos on the MLB.com website within the past two years." *See, e.g.*, ECF No. 2-5 at 2. The declarations do not specify what sign-up method the user used, when the user created an MLB.com account, when the user last logged in, or whether the user continued to use any MLBAM digital properties on or after February 6, 2024.

---

[3] The Court uses the term "digital properties" to mean MLB.com "and all materials contained in this [w]ebsite and/or otherwise accessible via other [MLBAM]-controlled products or services." 2020 TOU § 1, ECF No. 28-2; *see* Mem. at 11.

*See id.* The declarations all contain at least one email address, a dated signature, and a checked statement that "by checking this box and signing below, I state under penalty of perjury under the laws of the United States of America that this information is true and correct." *See id.*

MLBAM investigated its records for accounts associated with the email addresses Petitioners provided in their declarations and to counsel. Frost Decl. ¶¶ 37–40.[4] It found that the 5,628 Petitioners can be split into three distinct groups: 363 Petitioners who have no recorded MLB.com account; 5,120 Petitioners who have used at least one MLBAM digital property since February 6, 2024; and 145 Petitioners who have MLB.com accounts but have not used MLBAM's digital properties since February 6, 2024, while logged in to their account. *Id.* ¶¶ 37–40.

MLBAM also states that 655 Petitioners, including Ian Moore, are arbitrating or have arbitrated "similar" claims against MLBAM through other counsel in claims filed before February 6, 2024. *See id.* ¶ 41; Littman Decl. ¶ 3, ECF No. 28-9; ECF No. 28-10 (list of purportedly arbitrating individuals). However, "MLBAM does not provide the status of any particular supposedly pending or complete claim," and Petitioners argue that "AAA's own publicly available statistics seem to indicate that . . . there [have not] been close to 655 MLBAM customers who sought arbitration with AAA." Reply 15–16; *see* Waisnor Supp. Decl. ¶¶ 12–16, ECF No. 32.

II.     MLBAM Agreements

A. Methods of Agreeing to MLBAM's Terms of Use

MLBAM represents that there are several ways to agree to its Terms of Use ("TOU"). One way is by registering for an MLB.com account with one of the MLB Websites or one of the

---

[4] MLBAM's digital properties use a tool known as "Okta" that implements the preferences and settings of users with MLB.com accounts. Frost Decl. ¶ 37. Any user who creates an MLB.com account automatically receives a unique "OktaID" tied to that account. *Id.* MLBAM tracked each Petitioner's account activity using their "OktaID." *Id.*

MLBAM Services.[5]  Frost Decl. ¶ 5, 15.  For example, to sign up for an MLB.com account online, a user inputs their email address and clicks a button labeled "Register," above which is the text: "I understand and agree to be bound by the MLB.com <u>Terms of Use</u> and <u>Privacy Policy</u>."  *Id.* ¶¶ 15–17.[6]  MLBAM's TOU appears as a clickable hyperlink, offset by blue font.  *Id.* ¶ 16. Additionally, when individuals who already have a MLB.com account are prompted to log in again, text placed below the log-in button restates this agreement with clickable hyperlinks.  *See id.* ¶ 18 ("I understand and agree to be bound by the MLB.com <u>Terms of Use</u> and <u>Privacy Policy</u>"). Copies of the MLB.com log-in and registration pages are depicted below:



Registration Page, Frost Decl. ¶ 16.

---

[5] "MLB Websites" refers to MLB.com, as well as websites "for all 30 MLB clubs," for Minor League Baseball, for all Minor League Baseball Clubs, and for MLB.TV.  Frost Decl. ¶ 3.  "MLBAM Services" refers to MLB.TV, MLB At Bat, MLB App, and the Ballpark App.  *Id.* ¶ 4.

[6] The underlined text represents a clickable hyperlink.



Log-In Page, Frost Decl. ¶ 18.

Users of the MLB App and Ballpark App see similar log-in and registration pages on each app. *See* Frost Decl. ¶¶ 26–29 (MLB App), 30–34 (Ballpark App). Users are also presented with an additional link to the MLBAM TOU whenever purchasing tickets on the Ballpark App; they must click a button affirming the following text to place their order: "I agree to the following: By clicking 'Place Order', you accept the Terms & Conditions and MLB Terms of Use, as well as policies applicable to use." *Id.* ¶ 35.

In addition, MLBAM states that users who purchase a subscription to MLB.TV on an MLB digital property "must first register an account on MLB.com" and "agree to the MLB.com Terms of Use and Privacy Policy through the steps outlined above." *Id.* ¶ 22. And before purchasing an MLB.TV subscription on an MLB digital property, "users are again prompted to accept MLB's Terms of Use and Privacy Policy," via a purchase page with a large heading stating "Terms of Agreement & Cancellation Policy," text stating that "[b]y clicking . . . , I agree to the MLB.com Terms of Use," and a button stating "Buy & Accept Terms," which a user must click to proceed. *Id.* ¶ 23–24. A copy of the purchase page is depicted below:

5



MLB.TV Purchase Page, Frost Decl. ¶ 23.

Notably, however, when users purchase or access MLB.TV from third-party storefronts such as Amazon Prime, they are not required to log in or create an MLB.com account, and MLBAM "will only connect such an MLB.TV subscription to a user's MLB.com account[] if that user connects their MLB.TV subscription with their MLB.com account on an MLB-operated (as opposed to third-party operated) platform." *Id.* ¶ 7.

B.  MLBAM's Terms of Use

Petitioners claim that, by creating an MLB.com account, they agreed to MLBAM's TOU dated February 4, 2020 ("2020 TOU"), which required arbitration of their claims. *See generally* Pet.  The 2020 TOU provides in relevant part that "[a]ny and all disputes, claims or controversies arising out of or relating to this Agreement, the breach thereof, or any use of the MLB Digital Properties . . . shall be settled by binding arbitration."  2020 TOU § 11.1, ECF No. 28-2.

However, on February 6, 2024, MLBAM amended its TOU ("2024 TOU").  Frost Decl. ¶¶ 9, 11.  To notify users of the amendment, MLBAM sent "an email notifying users of changes contained in the 2024 TOU to all mailable email addresses associated with an MLB.com." *Id.* ¶ 12.  The email contained the subject line, "Updates to our Privacy Policy and Terms of Use

Agreement," hyperlinked the updated 2024 TOU, and explicitly stated that "[b]y continuing to use our services (including our websites and mobile applications) on or after February 6, 2024, you agree to our updated Privacy Policy and Terms of Use Agreement."  Email Notice, ECF No. 28-5; Frost Decl., ¶ 12.  A copy of the email is depicted below:



Email Notice.

In addition to the email, MLBAM notified users of the updated TOU via a banner on all MLBAM websites.  *See* Frost Decl. ¶ 13.  The banner stated, "By continuing to use our services, you agree to the updated Privacy Policy and [2024 TOU]."  *Id.*  "Users could not click to other areas of an MLBAM Website without affirmatively acknowledging the banner by taking some action."  *Id.*  Based on the webpage depiction, that action appears to be either clicking the "OK" button or clicking an "x" button to remove the ribbon.  *See id.* ¶¶ 13–14.  As of May 2025, a similar banner continued to appear on MLBAM websites.  *Id.* ¶ 14.  A depiction of the webpage and banner as of February 7, 2024 is provided below:



MLB.com Webpage Banner, Frost Decl. ¶ 14.

Unlike the 2020 TOU, the 2024 TOU provides that "any dispute or claim related to alleged violation of [a user's] privacy rights or interests . . . including but not limited to [] claims under the [VPPA] and corresponding state video privacy laws" is non-arbitrable. 2024 TOU § 11.1, ECF No. 28-3. Additionally, under the 2024 TOU, "issues that relate to the scope, validity, and enforceability of the arbitration agreement, class action waiver, or any of the provisions of [the arbitration agreement]" are for the Court, not an arbitrator, to decide. *Id.*

III.    Procedural History

On February 14, 2024, after MLBAM had already modified its TOU, Petitioners' counsel notified MLBAM of its claims and intent to arbitrate them under the 2020 TOU. *See* Littman Decl. ¶¶ 4–5. In September 2024, Petitioners filed 5,746 arbitration demands alleging violations of the VPPA and related privacy claims with the American Arbitration Association ("AAA"). *Id.* ¶ 7. By letter dated November 13, 2024, the AAA informed MLBAM that it would close the cases

of the 763 California-based Petitioners based on MLBAM's non-payment of an invoice.  *Id.* ¶ 10; AAA Ltr. I, ECF No. 28-17.  One month later, because MLBAM had not paid the initiation fee as to the remaining Petitioners, AAA closed their cases as well.  Littman Decl. ¶ 12.  Petitioners subsequently initiated this action to compel MLBAM to arbitrate.  *See generally* Pet.

## DISCUSSION

I.    <u>Motion to Compel Arbitration</u>

A.  Legal Standard

The Federal Arbitration Act ("FAA") provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Under the FAA, parties can petition a district court for an order directing that "arbitration proceed in the manner provided for in such agreement."  *Id.* § 4.  The FAA reflects a "liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted).  Because arbitration is a matter of contract, the FAA does not allow a court to compel arbitration unless it is satisfied that the parties agreed to arbitrate a dispute.  *See Coinbase, Inc. v. Suski,* 602 U.S. 143, 147–49 (2024).  To determine whether the parties have agreed to arbitrate, courts consider: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement."  *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).

In deciding a motion to compel arbitration, the Court applies "a standard similar to that applicable for a motion for summary judgment."  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).  The Court "consider[s] all relevant, admissible evidence" and "draw[s] all reasonable inferences in favor of the non-moving party."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d

Cir. 2016) (citation omitted).  "The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines v. Overstock.com, Inc.*, 380 Fed. App'x 22, 24 (2d Cir. 2010).

B.  Analysis

Petitioners have not demonstrated that the parties agreed to arbitrate their video privacy claims.  Because "[a]rbitration is strictly a matter of consent," *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (cleaned up), "disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes," *Coinbase*, 602 U.S. at 145.[7]  Because the 2024 TOU requires Petitioners' VPPA and other video privacy claims to be brought in court, to prove that the parties agreed to arbitrate these claims, the Court must determine whether the undisputed evidence shows that Petitioners agreed to the arbitration provision in the 2020 TOU but not the one in the 2024 TOU, or that the 2024 TOU is unenforceable and there is otherwise an agreement to arbitrate.  *See also Coinbase*, 602 U.S. at 150 (noting that "whether there is an agreement to arbitrate" turns on "the parties' supersession dispute" (citation omitted)).[8]

As an initial matter, Petitioners' sparse declarations do not, standing alone, demonstrate they agreed to the 2020 TOU.  Each identically states that they "signed up for an MLB.com account" in one of several different ways.  *See, e.g.*, ECF No. 2-5 at 2.  But the declarations do not

---

[7] Although MLBAM argues that New York state law applies to the contract formation issues present here, Petitioners, who cite both New York and California law throughout, do not identify which state's law governs.  *See, e.g.*, Mem. at 9–10; Reply at 6; Opp. at 9–10.  Neither party, however, claims a conflict in laws with respect to a determinative issue, *see generally id.*, and the Court observes that "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term," *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotations and citation omitted).  Regardless of which state's contract law applies, the Court is not persuaded that the parties have agreed to arbitrate the underlying dispute.

[8] Even if the 2020 TOU delegates questions of arbitrability to the arbitrator, *see* Mem. at 13–15; Reply at 2–3, the Court must first determine which TOU governs because the 2024 TOU contains a conflicting delegation provision delegating such questions to the Court.  *See* 2024 TOU § 11.1.  In other words, "whether these parties agreed to arbitrate arbitrability can be answered only by determining which contract applies," which requires the Court to examine contract formation. *Coinbase*, 602 U.S. at 150.

identify the steps taken to create their account and agree to the TOU, and, in fact, one of the listed actions—using a "television provider or Amazon Prime information"—does not involve creating an MLB.com account in the first place.  *See* Frost Decl. ¶ 7.  Indeed, MLBAM has introduced evidence that at least 363 Petitioners never created an MLB.com account.  *See id.* ¶ 40(a).

With respect to those Petitioners who do appear to have an MLB.com account as of May 9, 2025, Petitioners' declarations are silent as to the 2024 TOU, which was in effect when they initiated their claims, arguably supersedes the 2020 TOU, and does not contain an agreement to arbitrate.  *See generally* Frost Decl., Littman Decl., ECF No. 2-5 at 2–16.  Notably, Petitioners do not disclaim agreeing to the 2024 TOU.

MLBAM has presented evidence suggesting that the vast majority of Petitioners agreed to the 2024 TOU.  First, MLBAM has shown that it provided "reasonably conspicuous notice" of an updated TOU to its subscribers.  *Meyer v. Uber Techs.*, *Inc.*, 868 F.3d 66, 76 (2d Cir. 2017).  An email notice mentioned the updated TOU in the subject line, drew attention to and hyperlinked to the updated TOU in the body of the message, and specified that "[b]y continuing to use [MLBAM] services (including our websites and mobile applications) on or after February 6, 2024, you agree to our updated <u>Privacy Policy</u> and <u>Terms of Use Agreement</u>."  Frost Decl. ¶¶ 12; Email Notice.  In addition, MLBAM's websites included a conspicuous banner that hyperlinked to the updated TOU, informed users that continued use of MLBAM services constituted assent to the updated TOU, and required the user to click on the banner to access the website.  Frost Decl. ¶¶ 13; *see Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704 (2d Cir. 2023) ("[W]hen terms are linked on an 'uncluttered' interface and temporally and 'spatially coupled with the mechanism for manifesting assent,' and the user does not need to scroll beyond what is immediately visible to find the terms,

we have concluded, as a matter of law, that the interface provided reasonably conspicuous notice of the existence of contractual terms.").

Second, MLBAM has introduced evidence that the vast majority (5,120) of Petitioners accessed an MLB digital property after February 6, 2024, which supports a finding that they assented to the 2024 TOU.[9]  *See, e.g.*, *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 51 (E.D.N.Y. 2017) ("Courts applying New York law consistently have held that 'customers accept revised terms of their accounts by continuing to use their accounts after receiving the revised terms.'" (citation omitted)); *Pincaro v. Glassdoor, Inc.*, No. 16 Civ. 6870, 2017 WL 4046317, at *7 (S.D.N.Y. Sept. 12, 2017) (finding that a similar email notice of updated terms, followed by continued use of a website, constituted assent to the updated terms); *Sadlock v. Walt Disney Co.*, No. 22 Civ. 9155, 2023 WL 4869245, at *11–12 (N.D. Cal. July 31, 2023).

MLBAM admits that for 145 Petitioners, there is no evidence that they used MLBAM's digital properties after February 6, 2024, at least while logged in to their accounts.  *See* Frost Decl. ¶ 40(d).  Petitioners argue that MLBAM should, therefore, be compelled to arbitrate at least those 145 Petitioners' claims.  *See* Reply at 9.  But the undisputed evidence still falls short of demonstrating an agreement to arbitrate because these Petitioners may have assented to the 2024 TOU by, for example, continuing to access MLB Websites after being notified of the updated TOU on the website banner.  *See* Frost Decl. ¶¶ 13, 20; Opp. at 22–23; *Meyer*, 868 F.3d at 75–76 (discussing how a user manifests assent to different types of web-based contracts, such as "clickwrap," "browsewrap," and "sign-in wrap" agreements).  Petitioners do not deny receiving

---

[9] Merely accessing an MLBAM digital property is not conclusive proof of assent to the 2024 TOU.  *See Brooks v. WarnerMedia Direct, LLC*, No. 23 Civ. 11030, 2024 WL 3330305, at *11–12 (July 8, 2024) (noting, for example, that users may access a service merely to read the new terms and decide whether to accept them).

notice of the updated TOU or having accessed an MLB digital platform after the updated TOU became effective.

Petitioners also have not shown that the 2024 TOU is unenforceable. They have not demonstrated, for example, that the 2024 TOU may not apply to claims that arose before the 2024 TOU was in effect, *see, e.g.*, *Peng*, 237 F. Supp. 3d at 51; that MLBAM made a bad faith, targeted amendment to hinder Petitioners' claims, *see* Reply at 7–8, given that MLBAM only became aware of Petitioners' claims *after* the 2024 TOU became effective, Littman Decl. ¶ 4; or that the 2024 TOU provision requiring Petitioners' video privacy claims to be litigated in court is procedurally and/or substantively unconscionable under relevant state law, *see generally* Mem.; Reply.

Finally, Petitioners argue that MLBAM is estopped from opposing Petitioners' motion to compel arbitration because "MLBAM itself has argued to a federal court that VPPA claims like Petitioners' fall within the scope of the very same arbitration agreement at issue here." Mem. at 16. Not so. Judicial estoppel applies where "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001)). There is no clear inconsistency, as MLBAM's arguments here involve the 2024 TOU, which was not at issue in the other cases, and, in any case, Petitioners have not shown that any court, let alone this Court, has adopted MLBAM's "former position" as to the arbitrability of VPAA claims under the 2020 TOU. *See* Mem. at 16–17; Pet. ¶ 36 (citing *Hayes v. MLB Advanced Media, L.P.*, No. 22 Civ. 5822 (N.D. Ill.) and *Carroll v. MLB Advanced Media L.P.*, No. 23 Civ. 1216, 2023 WL 3320322 (C.D. Cal. Feb. 24, 2023)).

In sum, Petitioners have not persuaded the Court that the parties agreed to arbitrate their claims. However, because of outstanding factual questions related to Petitioners' assent to the TOUs, Petitioners may conduct limited discovery on this issue, and their motion is denied without prejudice to renewal after the completion of this targeted discovery. *See, e.g.*, *Khowala v. Vivint Smart Home, Inc.*, No. 23 Civ. 1068, 2024 WL 3638265, at \*5 (S.D.N.Y. Aug. 1, 2024); *Brooks v. WarnerMedia Direct, LLC*, No. 23 Civ. 11030, 2024 WL 3330305, at \*8 (July 8, 2024).

II.    Severance

The Court denies without prejudice MLBAM's cross-motion to sever Petitioners' claims because MLBAM did not file a pre-motion letter, as required by Rule III(A) of the undersigned's Individual Practices in Civil Cases. *See* Opp. at 10–14. The Court, however, has serious reservations about its ability to manage 5,628 separate dockets. *See id.* at 14. Should MLBAM renew its motion to sever, it is encouraged to consider whether severing Petitioners' claims based on certain factually or legally similar subgroups would better promote judicial economy and efficiency compared to requiring each Petitioner to proceed in a separate action.

14

## CONCLUSION

For the reasons stated above, Petitioners' motion to compel arbitration and stay the action, as well as Respondent's cross-motion to sever, are each DENIED without prejudice. Should the parties wish to conduct the targeted discovery authorized by the Court, that discovery shall close on **June 26, 2026**. By **July 13, 2026**, the parties shall file a status update indicating whether they intend to renew their motions. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 4.

SO ORDERED.

Dated: March 27, 2026
New York, New York

_____
ANALISA TORRES
United States District Judge